## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      **Plaintiff,**

v.

      **Case No. 17-40119-DDC**

KURTIS CLAY (01),
JUSTIN GREEN (02),

      **Defendants.**

### MEMORANDUM AND ORDER

On November 30, 2017, Trooper Adam Simone of the Kansas Highway Patrol ("KHP") stopped defendants Justin Green and Kurtis Clay on Interstate 70. After Trooper Simone gave defendants a warning, he asked Mr. Clay a series of additional questions that culminated with him asking for consent to search the vehicle. When Mr. Clay gave consent, Trooper Simone searched the vehicle and found a large sum of money. He immediately arrested both defendants for possessing drug proceeds, a violation of Kansas state law.

A short time later, KHP troopers transported defendants to a KHP office in Topeka, Kansas. During transit, Mr. Green made statements to Trooper Simone. And at the KHP office, both defendants made statements to various law enforcement officers.

Now, Mr. Clay has filed two motions. In the first, Mr. Clay asserts that law enforcement officers falsely told him he was not under arrest and so, his waiver of his *Miranda*[1] rights was not voluntary. For this reason, Mr. Clay seeks to suppress statements he made after the waiver. Mr. Clay's second motion asserts that law enforcement officers lacked reasonable suspicion to

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

justify a traffic stop and probable cause to arrest him.  So, Mr. Clay seeks to suppress evidence secured from the traffic stop and arrest.  Mr. Green has joined Mr. Clay's second motion.  For reasons explained later in this Order, the court concludes that Mr. Clay's arrest violated the Fourth Amendment, so the court suppresses certain evidence and statements acquired after Mr. Clay's arrest in the case against him.  But, because the court determines that Mr. Green's arrest was valid, the court does not suppress evidence or statements acquired after Mr. Green's arrest in the case against him.

## I.    Background

The following facts are taken from the evidence presented at the July 24, 2018, motion hearing.

### A.    Traffic Stop

Around 10:55 a.m. on Thursday, November 30, 2017, Trooper Simone was traveling eastbound on I-70 in Wabaunsee County, Kansas.  He then turned into a cut-through between the eastbound and westbound sides of the interstate and parked on the southern side of the westbound lanes.  Trooper Simone positioned his patrol vehicle so the nose of the vehicle was facing west.  In this position, vehicles traveling on the westbound side would overtake his position and he could observe them after they had passed.

Within seconds of positioning his vehicle, Trooper Simone saw two SUVs traveling in the right lane of eastbound traffic.  He noted that the two SUVs were traveling at "highway speeds."  Although Trooper Simone could not provide an exact speed, he estimated that they were traveling between 70 and 80 mph.  Trooper Simone also noticed that the second SUV, a Nissan Rogue, was gaining on the first SUV.  And as he watched, the Rogue came within two to

three car lengths of the first SUV.  At that time, Trooper Simone decided to stop the Rogue for following too closely.

Trooper Simone pulled out of his position onto the highway.  Within 30 seconds, he had caught the Rogue.  By then, the Rogue had backed off the first SUV so, according to Trooper Simone, it was no longer following too closely.  Trooper Simone paced the Rogue briefly and then pulled behind it, initiating his emergency lights.  The Rogue then pulled off the interstate and parked on the shoulder of a weigh station entrance.[2]

Once the vehicles were stopped, Trooper Simone walked up to the window on the passenger side of the Rogue.  He explained to the Rogue's occupants that he had stopped them because the Rogue was following another vehicle too closely.  Trooper Simone then asked for their driver's licenses and proof of insurance.  At that point, he identified the driver as Justin Green and the passenger as Kurtis Clay—both defendants in this case.

Next, Trooper Simone asked about defendants' travel plans.  Trooper Simone testified that Mr. Clay, the passenger, answered all the questions.  Mr. Green appeared very nervous and stayed quiet.  First, Trooper Simone asked where they were going.  Mr. Clay paused and then responded, "Uh . . . Pratt."  Def. Ex. C at 3:12–3:17.  Trooper Simone also asked how long they were going to be there and their purpose in Pratt, Kansas.  He learned that they were headed to an ethanol plant for a week or two.  Trooper Simone followed these answers with a series of additional questions—the name of the plant in Pratt, the name of the business where Mr. Clay

---

[2]     When a KHP trooper activates his emergency lights, the dash mounted camera in the patrol vehicle is activated as well.  This activation prompts the recording system for the camera to preserve the last two minutes of video.  But it captures no audio for those two minutes.  Accordingly, Defendant's Exhibit C at the July 24, 2018, motion hearing—a video recording from Trooper Simone's dash camera—starts before Trooper Simone pulled into the cut-through.  But the audio starts as Trooper Simone activates his lights.

worked, and whether Mr. Green worked with Mr. Clay. Mr. Clay answered these questions, and Trooper Simone discovered that Mr. Clay and Mr. Green did not work together.

During this interaction, Mr. Green admitted that his license was suspended, causing the trooper to ask why he was driving. After learning that defendants were coming from Sparta, Illinois, he asked where Sparta was located. The trooper also requested the Rogue's rental agreement. Trooper Simone mistakenly noted that the vehicle was due for return that day. Mr. Clay responded, explaining that he could keep the SUV longer because the rental car company would just charge him for the extra days. Before returning to his patrol vehicle, the trooper told defendants that he would write a warning ticket. As Trooper Simone returned to his patrol car, he stopped and peered into the SUV's rear passenger side window.

**B.     Traffic Checks**

Trooper Simone had a "ride-along" with him on the day of this traffic stop—Sergeant Logan Littel with the Kansas National Guard. According to Trooper Simone, Sgt. Littel conducted analyst work for KHP and routinely rode along on highway patrols with KHP troopers. Sgt. Littel had waited in the patrol vehicle while Trooper Simone spoke with defendants. Once Trooper Simone got back to the patrol vehicle, he discussed the stop with Sgt. Littel. They discussed defendants' travel plan to Pratt and commented about the absence of luggage for a visit that was projected to last a week or two.

Trooper Simone recited defendants' identification to his dispatcher and asked dispatch to check defendants using the National Crime Information Center's Interstate Identification Index. After providing that information, Trooper Simone investigated the "best route" from Illinois to Pratt, and Sgt. Littel investigated whether there was an ethanol plant in Pratt. Trooper Simone

told Sgt. Littel that the best route would have been to take I-70 to I-35 South.  But he also recognized that one could get to Pratt by taking I-70 to Salina, then south.

Trooper Simone also noted that the driver (Mr. Green) was not talking and "really nervous."  Def. Ex. C at 7:10–7:18.  Trooper Simone speculated that his behavior may have been because he had a suspended license or even a warrant.  Sgt. Littel found "Pratt Energy Ethanol Plant."  And Trooper Simone said he wondered if Mr. Clay had been "there" before and was just using it as a ruse because he had a CDL.  Trooper Simone also questioned why Mr. Clay would bring a passenger with him on an extended business trip.

Trooper Simone noted that Mr. Clay, rather than his employer, had rented the car.  Also, Trooper Simone learned that Mr. Clay had rented the Rogue nine days earlier on November 21 in O'Fallon, Illinois.  He also discovered that the Rogue was actually due back two days earlier, on November 28—not the day of the stop, as he originally thought.  Trooper Simone also commented on the absence of luggage.  As they talked, Trooper Simone verified that Sparta, Illinois, is southeast of St. Louis.  Sgt. Littel called the agency Mr. Clay had used to rent the Rogue and inquired about the rental agreement.  He asked an employee of the rental agency whether Mr. Clay had extended his rental agreement.  The employee confirmed that the agency had received a $200 deposit from Mr. Clay, so he is "good through today."  *Id.* at 13:40.

While Sgt. Littel was on the phone, dispatch responded with the criminal histories for Mr. Clay and Mr. Green.  Dispatch informed the officers that Mr. Green had a revoked driver's license from Sparta, Illinois, but the report did not provide a reason for this revocation.  Also, the Interstate Identification Index—Triple I—showed that Mr. Green had criminal history from the late 1990s for conspiracy to distribute cocaine base.  Mr. Clay had a valid commercial driver's license with an intrastate tanker endorsement, also from Sparta.  The Interstate Identification

Index showed that Mr. Clay had a 2003 charge for possessing a controlled substance, resolved in 2006 as manufacture or delivery of a controlled substance, resulting in a sentence of three years with time served. Both officers commented on Mr. Clay's and Mr. Green's criminal history— "both have a pretty good history." Trooper Simone said, "Hopefully we can get a dog out." *Id.* 13:45–13:55.

After he received the criminal history information, Trooper Simone returned to the passenger side of the Rogue. He told defendants that he was going to "cut [them] a break today," noting that Mr. Green's driver's license was revoked, and he was not supposed to be driving. *Id.* at 14:08–14:13. Trooper Simone instructed defendants to switch positions and said that he would write Mr. Green a warning for following too closely. He then told them to "have a safe trip." *Id.* at 14:25–14:27.

### C.    Consent to Search

As defendants exited the Rogue to switch drivers, Trooper Simone asked Mr. Clay if he would mind if the trooper asked some more questions. Mr. Clay responded, "Yeah." *Id.* at 14:27–14:32. In context and given that Mr. Clay readily answered the questions that followed, this response amounted to consent. The trooper began asking whether defendants had anything illegal in the car. Mr. Clay responded "no." Trooper Simone specifically listed guns, marijuana, methamphetamine, cocaine, or large amounts of currency. After each item, Mr. Clay said "no." After this series of questions, Trooper Simone asked Mr. Clay for consent to search the vehicle, which he granted.

The trooper then asked defendants to stand in front of the Rogue. As they moved in that direction, Trooper Simone asked each if he could pat him down. Neither objected and he frisked

both before instructing them to stand near a metal post.  As defendants stood at the post, Sgt.

Littel watched them, and Trooper Simone opened the Rogue's back hatch to begin searching.

After opening a small striped bag in the back-cargo area, the trooper walked up to Mr.

Clay, told him to turn around, and handcuffed him.  The trooper then handcuffed Mr. Green.

Trooper Simone brought defendants back toward the patrol car and explained that he had found a

"large amount of currency in the back."  *Id.* at 16:28–16:32.  Trooper Simone told them that the

Highway Patrol would take them to a Patrol office, for "a little bit of a follow-up investigation."

*Id.* at 16:32–16:39.  He then told defendants that he believed that they had been traveling to

Colorado or California to buy "marijuana, meth, cocaine, something like that."  *Id.* at 16:40–

16:48.  Trooper Simone put Mr. Green in the front passenger seat of his patrol car and told Mr.

Clay and Sgt. Littel that other officers were on the way to drive them.

After Trooper Simone instructed Mr. Clay to stand in the front of the patrol car, Mr. Clay

asked what they were being charged with.  The trooper responded that he was going to take some

photographs, read Mr. Clay his *Miranda* rights, and then ask him a few questions.  But he

believed they were in "possession of drug proceeds, which is against the law in Kansas."  *Id.* at

17:25–17:40.  Responding to Mr. Clay's follow-up question, Trooper Simone confirmed that this

offense was a felony.

Mr. Clay said that defendants were unaware that it—presumably referring to the

money—"was back there."  *Id.* at 17:45–17:51.  The trooper responded that he did not want to

discuss the matter until he had read the *Miranda* warnings to Mr. Clay.  The trooper

photographed the evidence and searched the SUV.  Trooper Simone called "Sean" to see if he

was working; he let him know that they just "got a money load" and asked if he should read

*Miranda* on the way to the station or if he should wait.  *Id.* at 23:13–23:50.  "Sean" confirmed

that reading *Miranda* to Mr. Green while on the way was fine. While speaking with law enforcement officers, Trooper Simone estimated the value of the currency as $40,000 to $50,000.

### D.     Mr. Green's Questioning

Trooper Simone drove Mr. Green to KHP's Troop B/Troop N office in Topeka, Kansas. During the drive, Trooper Simone read Mr. Green his *Miranda* rights and asked Mr. Green if he was willing to talk. Mr. Green confirmed that he understood his rights and agreed to talk about the money. After initially asking a series of questions about the money, Trooper Simone sporadically asked questions during the rest of the trip.

At the KHP office, Mr. Green was interviewed twice more. First, Task Force Officer ("TFO") Luke Rieger, a KHP trooper assigned to the Drug Enforcement Administration, questioned him. And then, Secret Service Agent Paul York questioned Mr. Green.

### E.     Mr. Clay's Questioning

Law enforcement officials also interviewed Mr. Clay at the KHP office. First, TFO Rieger conducted an interview. Before he started this interview, TFO Rieger advised Mr. Clay of his *Miranda* rights. And Mr. Clay signed a form waiving those rights. *See* Gov. Ex. 1. TFO Rieger then questioned Mr. Clay.

Later, Agent York interviewed Mr. Clay. Agent York confirmed that officers already had given Mr. Clay his *Miranda* warnings, then said that because he was a federal agent he had to do it again. Before reading the *Miranda* warnings to Mr. Clay, the agent told him that he could stop talking or get an attorney at any time. Mr. Clay responded by asking, "Am I under arrest?" Agent York told him "no, not right now, no." Mr. Clay agreed to talk to the agent, who then said that "right now you're just being detained pending an investigation. For federal . . . the way the federal (*sic*) works we just read your *Miranda* rights, but yeah, you're not under arrest." The

agent read Mr. Clay his *Miranda* rights, and expounded, "I'm not here to arrest you, I'm not arresting you right now, we're just trying to do an investigation." Def. Ex. D at 00:55–01:51. Mr. Clay signed another waiver of rights form. Mr. Clay was handcuffed during the entire interrogation. At the end of the questioning, Mr. Clay was booked into the Wabaunsee County Jail.

During their investigation, law enforcement agents gathered additional evidence from the rented Rogue and defendants themselves. It included a package of counterfeit detector pens, evidence from cell phones that Mr. Clay and Mr. Green possessed, and fingerprint evidence taken from the currency.

Now, with the two motions, Mr. Clay asks the court to find that law enforcement officers violated the Fourth and Fifth Amendments. Mr. Green asks the court to find Fourth Amendment violations by law enforcement. The court addresses the defendants' Fourth Amendment arguments first. Because Mr. Clay's Fourth Amendment arguments convince the court to suppress fruits derived from his illegal arrest, the court need not address Mr. Clay's Fifth Amendment arguments.

## II.     Motion to Suppress Under the Fourth Amendment

### A.     Legal Standard

The Fourth Amendment[3] to our Constitution forbids unreasonable searches and seizures. *California v. Carney*, 471 U.S. 386, 390 (1985). When a defendant challenges the reasonableness of a search or seizure, the government bears the burden to prove by a preponderance of the evidence that the challenged search or seizure was reasonable. *United*

---

[3]     "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

*States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001).  If the court determines that a search or seizure violated the Constitution, the exclusionary rule prohibits admission of the fruits of all evidence seized illegally.  *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

    **B.**    **Analysis**

    Both defendants challenge:  (a) whether Trooper Simone possessed reasonable suspicion to make the initial traffic stop; and (b) whether he possessed probable cause to arrest them for possessing drug proceeds.  The court addresses all the relevant issues in this traffic stop—albeit more briefly than it would had defendants challenged all aspects of the stop.  Ultimately, the court concludes that Trooper Simone possessed reasonable suspicion to make the initial traffic stop.  He also possessed probable cause to arrest Mr. Green for driving with a revoked driver's license.  But Trooper Simone did not possess probable cause to arrest Mr. Clay for possessing drug proceeds.  Accordingly, Mr. Clay is entitled to suppress some evidence.  But Mr. Green is not.

    **1.**    **Traffic Stop**

    The court begins the analysis with the traffic stop.  "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment]."  *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  A traffic stop can pass Fourth Amendment muster "if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).  Reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity."  *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal quotation and citation omitted).

The government argues Trooper Simone lawfully could stop defendants for following too closely. Kansas law prohibits a driver from following another vehicle "more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Kan. Stat. Ann. § 8-1523(a). The Tenth Circuit and Kansas courts have applied the "car-length" and "two-second" rules to determine reasonable and prudent behavior. The "car-length" rule suggests that—depending on road and weather conditions—a driver should maintain one car length—or about ten to fifteen feet—for every ten miles per hour. *United States v. Vercher*, 358 F.3d 1257, 1261–62 (10th Cir. 2004). In *Vercher*, the Circuit found 100 to 150 feet was a reasonable and prudent distance when traveling at 70 mph. *Id.* Under the "two-second" rule, the driver should maintain a distance of at least two seconds between vehicles. *United States v. Hunter*, 663 F.3d 1136, 1142–43 (10th Cir. 2011). The "two-second" rule is contained in the Kansas Driver's Handbook, and it is the measurement recommended by the Kansas Highway Patrol. *United States v. Hunter*, 663 F.3d 1136, 1143 (10th Cir. 2011).

The Kansas Driver's Handbook provides:

The law requires that you not follow a vehicle more closely than what is "reasonable and prudent." Weather, road conditions, and traffic will influence how far this distance is. You must be able to stop or turn in order to avoid a collision if the vehicle in front of you suddenly stops. Use the two second rule for measuring a safe following distance under prime conditions. Under adverse conditions use a four second following rule. When you are following vehicles which stop often or make sudden turns (buses, delivery vans, police cars etc.) you should increase your following distance. When driving in bad weather you should increase your following distance even more.

Following too closely reduces the ability to see road and traffic conditions ahead. Without seeing what is ahead it is more difficult to avoid trouble as it develops.

Kan. Driver's Handbook at 11–12, *available at* https://www.ksrevenue.org/pdf/dlhb.pdf.

Here, within seconds of parking his car in a stationary position, Trooper Simone saw defendants' Rogue following the SUV in front of it with no more than two or three car lengths of separation.[4]  Although a red pickup truck passed these vehicles on the left shortly after they passed Trooper Simone's position, the left lane was clear when defendants began following too closely.  While the Kansas statute does not specifically define a "reasonable and prudent" following distance, Trooper Simone employed a well-established metric to determine that defendants were following more closely than reasonable and prudent for the conditions.  The court thus concludes that Trooper Simone had reasonable suspicion to believe Mr. Green had violated Kan. Stat. Ann. § 8-1523(a), making the traffic stop valid.

Defendants argue that the traffic conditions would not allow Mr. Green to slow down and create distance from the SUV in front of them.  Specifically, they contend that the red pickup truck was following them closer than they followed the other SUV.  So, braking would have caused an unsafe condition for the truck behind them.  The court is not convinced by this argument because, as it already noted, the left lane was clear and provided defendants an alternative to following too closely.

## 2.    Consensual Encounter and Consent to Search

After Trooper Simone completed the stop, his interaction with defendants continued in a consensual encounter.  "Once an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." *United States v. Villa*, 589 F.3d 1334, 1339 (10th Cir. 2009).  But, "[a]dditional questioning unrelated to the traffic stop is permissible if the detention becomes a consensual encounter.

---

[4]    Trooper Simone testified that he could not employ the "two-second" rule because the vehicles passed his position too quickly.  And by the time he caught up to the Rogue, it had backed off the SUV in front of it.  So, the only metric Trooper Simone could use to judge whether the Rogue's following distance was reasonable and prudent was the "car-length" rule.

Whether the driver has consented to additional questions and detention turns on whether a reasonable person would believe he was free to leave or disregard the officer's request for information." *Id.* at 1339–40 (internal quotations and citations omitted).

So, the court must determine whether the encounter between Trooper Simone and defendants became a consensual one or, alternatively, if Trooper Simone had reasonable suspicion to prolong the detention. *See United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998) ("Lengthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." (citations omitted)).

Neither defendant challenges that Mr. Clay consented to the questions after Trooper Simone told them to switch positions in the Rogue and to "have a safe trip." Because Trooper Simone returned the defendants' documents and wished them a safe trip, the court concludes that the encounter continued in a consensual matter. *See United States v. Ledesma*, 447 F.3d 1307, 1315 (10th Cir. 2006) ("Phrases like 'thank you' and 'have a safe one' signal the end of an encounter, and afford a defendant an opportunity to depart. Although he did not explicitly inform [the driver] and her passenger that they were free to leave, [the trooper's] words of farewell suggested that any subsequent discussion was consensual.").

There is some ambiguity about Mr. Clay's consent to additional questions. But the court concludes Mr. Clay did consent. Trooper Simone asked Mr. Clay if he minded if Trooper Simone asked a few more questions. Mr. Clay responded, "Yeah." While this response—in the strictest sense—suggests Mr. Clay would mind if Trooper Simone asked more questions, the

13

encounter proceeded in a manner consistent with Mr. Clay consenting.  Indeed, Mr. Clay does

not challenge that he provided consent for additional questions.  And the factors the Tenth

Circuit uses to determine whether the encounter was consensual—"an officer's 'pleasant'

manner and a tone of voice that is not 'insisting;' a public location such as the shoulder of an

interstate highway, in public view; and the prompt return of the defendant's identification and

papers," *id.*—also suggest the encounter was consensual.  And so, the court determines that Mr.

Clay consented to Trooper Simone's questions.

In his series of additional questions, Trooper Simone asked whether Mr. Clay had any

contraband—guns, drugs, or large amounts of currency—in the Rogue.  After these questions,

Trooper Simone asked Mr. Clay for consent to search.  Mr. Clay again consented.  It is well-

settled that law enforcement may search without a warrant when consent is given.  *Schneckloth*

*v. Bustamonte*, 412 U.S. 218, 219 (1973).  And neither defendant argues that Mr. Clay's consent

was anything other than voluntary.  *See United States v. Toledo*, No. 96-10069-01, 1996 WL

766527, at *3 (D. Kan. Dec. 12, 1996) ("Whether consent is voluntarily given is a question of

fact to be determined from the totality of the circumstances." (citing *Schneckloth v. Bustamonte*,

412 U.S. at 227)).  The court thus concludes that Mr. Clay's consent to search the vehicle was

voluntary.  During his subsequent search, Trooper Simone located a large sum of money.  After

Trooper Simone discovered this sum of money, he arrested both defendants on suspicion that

they possessed drug proceeds.

### 3.     Probable Cause to Arrest

Defendants argue that Trooper Simone lacked probable cause to arrest them.  The Fourth

Amendment protects an individual's right to privacy and from government trespass.  U.S. Const.

amend IV.  A seizure is authorized when a warrant is issued, justified by probable cause, and

describes the person to be seized. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). But, under Kansas law, a law enforcement officer may arrest an individual—without a warrant—when the officer has probable cause to believe that the individual is committing or has committed a felony or a misdemeanor. Kan. Stat. Ann. § 22-2401. And the Supreme Court has recognized that a "warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). "Probable cause exists where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925) (internal quotation marks omitted)).

The government contends Trooper Simone had probable cause to believe defendants possessed drug proceeds. Kansas law makes this crime a felony. Kan. Stat. Ann. § 21-5716(e). The specific provision provides:

> (a) It shall be unlawful for any person to receive or acquire proceeds or engage in transactions involving proceeds, known to be derived from a violation of K.S.A. 21-5701 through 21-5717, and amendments thereto, or any substantially similar offense from another jurisdiction . . . .

> (b) It shall be unlawful for any person to distribute, invest, conceal, transport or maintain an interest in or otherwise make available anything of value which that person knows is intended to be used for the purpose of committing or furthering the commission of any crime in K.S.A. 21-5701 through 21-5717, and amendments thereto, or any substantially similar offense from another jurisdiction.

> (c) It shall be unlawful for any person to direct, plan, organize, initiate, finance, manage, supervise or facilitate the transportation or transfer of proceeds known to be derived from commission of any crime in K.S.A. 21-5701 through 21-5717, and amendments thereto, or any substantially similar offense from another jurisdiction.

*Id.* § 21-5716.

The government bases its probable cause analysis, in part, on the sum of money Trooper Simone discovered in defendants' car.  When a vehicle's occupants are arrested based on the vehicle's content, the probable cause analysis has two parts.  They are:  (1) whether the vehicle's content gives rise to probable cause to believe a crime has been committed; and (2) whether the officer possessed probable cause to believe an occupant of the vehicle has committed the crime. *Pringle*, 540 U.S. at 370.  Because the court concludes that the vehicle's content falls short of what's needed to support probable cause, the court does not address the second prong of this test.

The Tenth Circuit and the Kansas Supreme Court have recognized that possessing a large sum of currency, by itself, is insufficient to support an inference of nexus to drug activity. *United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two and 43/100 Dollars ($149,442.43) in U.S. Currency*, 965 F.2d 868, 877 (10th Cir. 1992) ("[A] large amount of hidden currency in itself is not enough to establish that the money was furnished or was intended to be furnished in return for drugs . . . ."); *see also State v. Fitzgerald*, 192 P.3d 171, 175 (Kan. 2008) ("A large amount of currency, standing alone, is not necessarily an indication of criminal activity."), *abrogated on other grounds by State v. Sanchez-Loredo*, 272 P.3d 34 (Kan. 2012).  But when the money "is accompanied by other persuasive evidence such as the presence of drugs and drug paraphernalia, and notebooks containing notations of large drug transactions," probable cause likely exists that the money "is either proceeds of or was used to facilitate drug trafficking."  *One Hundred Forty-Nine Thousand Four Hundred Forty-Two and 43/100 Dollars ($149,442.43) in U.S. Currency*, 965 F.2d at 877.

The government contends Trooper Simone had "other persuasive evidence" here. Specifically, Trooper Simone testified that five facts led him to believe the large sum of money was drug proceeds. They are:

1. Mr. Clay had a passenger on a business trip;

2. Mr. Green appeared very nervous and was not talking;

3. Defendants had very little luggage in the vehicle for a one-to-two-week trip;

4. Defendants took an indirect route; and

5. Defendants both had prior arrests for distribution of drugs.

While the government cites case authority where each of these facts contributed to a probable cause finding, the court finds two other cases more instructive. Those cases are: *Pringle*, 540 U.S. at 366; and *State v. Romo-Uriarie*, 97 P.3d 1051 (Kan. Ct. App. 2004).

In *Pringle*, the Supreme Court concluded that, based on the vehicle's contents, probable cause existed to believe a crime had been committed. *Pringle*, 540 U.S. at 374. In that case, a law enforcement officer discovered $736 and five plastic baggies of cocaine in the vehicle. Likewise, in *Romo-Uriarie*, the Kansas Court of Appeals found probable cause existed when an officer discovered a large sum of money. 97 P.3d at 1060. But the Kansas court found other factors supported probable cause. They were: (1) inconsistent statements to the officer; (2) a drug dog alerting to the truck twice; (3) defendants not acknowledging the money's presence; (4) a High Times subscription card; (5) a sentencing grid applicable to drug crimes; (6) defendants' assertion that the money was loan proceeds; and (7) a past drug-related crime. *Id.*

There is a common element in those two cases that does not present itself here—"other persuasive evidence." While the government contends other facts provide the requisite persuasive evidence, those facts are not indicative of current drug activity. The "other persuasive

evidence" noted by the Tenth Circuit included "the presence of drugs and drug paraphernalia, and notebooks containing notations of large drug transactions." *See One Hundred Forty-Nine Thousand Four Hundred Forty-Two and 43/100 Dollars ($149,442.43) in U.S. Currency*, 965 F.2d at 877. The facts presented by the government here won't fit into that category. The only link to drugs in this case is the defendants' criminal history. But both defendants' history was more than a decade old. And none of the other factors found in *Pringle* and *Romo-Uriarie* are present here.

In short, the government tries to support probable cause with innocuous facts and a bag of cash. This won't carry the day. The court finds Trooper Simone lacked probable cause to arrest either defendant for possessing drug proceeds.

But Trooper Simone had another basis to arrest Mr. Green—he was driving with a revoked license. Kansas law provides:

> Any person who drives a motor vehicle on any highway of this state at a time when such person's privilege so to do is canceled, suspended or revoked or while such person's privilege to obtain a driver's license is suspended or revoked pursuant to K.S.A. 8-252a, and amendments thereto, shall be guilty of a class B nonperson misdemeanor on the first conviction and a class A nonperson misdemeanor on the second or subsequent conviction.

Kan. Stat. Ann. § 8-262(a)(1). When a law enforcement officer stops a person for a traffic violation constituting a misdemeanor, the officer has the discretion to take that person into custody. *Id.* § 8-2104(b).

Here, Trooper Simone observed Mr. Green operating a vehicle. And Mr. Green admitted to Trooper Simone that his license was suspended (Trooper Simone later learned it was revoked). When he learned this, Trooper Simone possessed probable cause to arrest Mr. Green for violating § 8-262(a)(1).

In sum, Trooper Simone lacked probable cause to arrest either defendant for possessing drug proceeds. But he possessed probable cause to arrest Mr. Green for violating § 8-262(a)(1). And so, the court now must decide whether suppression is appropriate for each defendant.

### 4. Suppression

Because Trooper Simone lacked probable cause to arrest Mr. Clay, his arrest violated the Fourth Amendment. "[E]vidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search or seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974). If the court determines that a search or seizure violated the Constitution, the exclusionary rule prohibits admission of the fruits of all evidence seized illegally. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

Here, Trooper Simone and other law enforcement officials discovered the large sum of currency before Mr. Clay's arrest, and they secured additional evidence and statements from Mr. Clay after his arrest. The court concludes that all of Mr. Clay's statements after his arrest are fruits of that illegal arrest and thus prohibits the government from using those statements as evidence on the criminal charge against Mr. Clay because he is "the victim of the illegal . . . seizure." *See Calandra*, 414 U.S. at 347.

The physical evidence presents a thornier question. Currently, the court understands the evidence to establish that law enforcement officers did not discover the counterfeit detector pens until after Mr. Clay was wrongfully arrested. Likewise, it appears, law enforcement extracted information from Mr. Clay's phone, lifted fingerprints from the seized currency, and diagnosed that some of the currency was counterfeit, but not until after Mr. Clay's arrest. At least some of this evidence appears to constitute fruit of the illegal arrest and thus the court must exclude that poisoned fruit.

But the record isn't sufficiently developed to decide this aspect of the motion.  Likewise, the parties' briefing doesn't address the question as fully as the court desires.  Consequently, the court leaves Mr. Clay's Motion to Suppress Evidence (Doc. 42) pending and sets the case for a status conference for Tuesday, August 21, 2018, at 9:00 a.m.  The court directs counsel to confer and come to that conference prepared to propose a schedule that will allow the parties to develop and address this remaining question fully.

The government argues that even if Mr. Clay's seizure violated the Constitution, then the court still should not suppress the fruits.  While this would negate the court's need to decide what is and isn't a fruit of Mr. Clay's wrongful arrest, the court is not persuaded by the government's argument.

If a search or seizure has violated the Constitution, the fruits and instrumentalities of the search or seizure are subject to exclusion if suppressing the illegally derived evidence serves to deter improper police practice or conduct.  *United States v. Leon*, 468 U.S. 897, 918–19 (1984).  Sure enough, suppression is not "an automatic consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 137 (2009).  Suppression as a judicially created remedial measure stems from abuses that "featured intentional conduct that was patently unconstitutional."  *Id.* at 143–44.  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. . . .  [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  *Id.* at 144.

The Tenth Circuit has recently reiterated the reach of this exception to suppression. "[T]he Supreme Court has 'limited [the reach of this good faith] exception to circumstances

where someone other than a police officer has made the mistaken determination that resulted in the Fourth Amendment violation." *United States v. Nelson*, No. 16-3292, 2017 WL 3526570, at *5 (10th Cir. Aug. 17, 2017) (quoting *United States v. Herrera*, 444 F.3d 1238, 1249 (10th Cir. 2006)).  To date, the Supreme Court has applied the doctrine in just four circumstances:  (1) when an officer's good faith relied on a subsequently invalidated search warrant, *Leon*, 468 U.S. at 922; (2) when an officer's good faith relied on a subsequently invalidated statute, *Illinois v. Krull*, 480 U.S. 340, 359 (1987); (3) when an officer's good faith relied on a database negligently maintained by others, *Herring v. United States*, 555 U.S. 135, 137 (2009); and (4) when an officer's good faith relied on binding appellate precedent that was subsequently overruled, *Davis v. United States*, 564 U.S. 229, 241 (2011).

Here, Trooper Simone made the mistaken determination that resulted in a Fourth Amendment violation.  He concluded, contrary to Kansas law, that possession of a large amount of cash established probable cause to arrest Mr. Clay on a drug proceeds charge.  As already explained, he was incorrect.  *See Romo-Uriarie*, 97 P.3d at 1060.  This situation does not present one of the four scenarios where the Supreme Court has applied the doctrine, and the good faith exception does not apply here.

While Mr. Clay's arrest was not supported by probable cause, Mr. Green's was.  And so, he is not entitled to suppress any evidence derived from his arrest.

## III.   Conclusion

In sum, Trooper Simone possessed reasonable suspicion to stop Mr. Clay and Mr. Green for following too closely.  But he lacked probable cause to arrest either defendant for possessing drug proceeds.  Trooper Simone did possess, however, probable cause to arrest Mr. Green for driving with a revoked license.  The court suppresses fruits of Mr. Clay's unlawful arrest.  These

21

fruits include all of Mr. Clay's post-arrest statements.  But on the current record, the court cannot discern the physical evidence amounting to such fruits.  And so, the court requires additional argument from the parties on this topic.

Mr. Clay also asks the court to suppress his statements for Fifth Amendment reasons. The court sees no reason to conduct an analysis of those arguments when it has already suppressed those statements based on a Fourth Amendment violation.  The court thus denies Mr. Clay's Motion to Suppress Statements (Doc. 41) as moot.

Finally, Mr. Green was lawfully arrested.  And so, the court does not suppress any evidence acquired from or any statements made by Mr. Green.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Kurtis Clay's Motion to Suppress Evidence (Doc. 42) will remain pending.  The court has concluded that it will grant defendant Kurtis Clay's Motion to Suppress Evidence (Doc. 42) as it requests suppression of evidence in his case.  And it will deny the motion to the extent that defendant Justin Green requests suppression of evidence in the prosecution against him.  But the court will keep the motion pending until it can address the specific evidence subject to its suppression ruling.

**IT IS FURTHER ORDERED THAT** defendant Kurtis Clay's Motion to Suppress Statements (Doc. 41) is denied as moot.

**IT IS FURTHER ORDERED THAT** the parties appear for a status conference on Tuesday, August 21, 2018, at 9:00 a.m.  The court directs counsel to confer and come to that conference prepared to propose a schedule that will allow the parties to develop and address the issue of the fruits of Mr. Clay's illegal arrest.

**IT IS SO ORDERED.**

**Dated this 15th day of August, 2018, at Topeka, Kansas.**

_s/ Daniel D. Crabtree_
**Daniel D. Crabtree**
**United States District Judge**